1
2
3

### UNITED STATES DISTRICT COURT

4

### FOR THE EASTERN DISTRICT OF CALIFORNIA

5
6
7
8
9
10
11
12
13
14
15

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE, ACCURACY & RELIABILITY, a California public interest organization,<br><br>        Plaintiff,<br><br>    v.<br><br>MARK W. COWIN, In his Official Capacity As Director Of CALIFORNIA DEPARTMENT OF WATER RESOURCES; SALLY JEWELL, Secretary, U.S. Department of the Interior, in her official capacity; DAN ASHE, Director, U.S. Fish and Wildlife Service, in his official capacity; and UNITED STATES FISH AND WILDLIFE SERVICE<br><br>        Defendants. | CASE NO: 1:15-CV-01852 LJO BAM<br><br>MEMORANDUM DECISION AND ORDER DENYING IN PART AND REQUESTING SUPPLEMENTAL BRIEFING RE MOTION TO DISMISS; AND HOLDING IN ABEYANCE MOTION TO AMEND<br>(Docs. 10 & 18) |

16

### I. INTRODUCTION

17

The operative Complaint, filed November 19, 2015 by the Center for Environmental Science,

18

Accuracy & Reliability ("CESAR" or "Plaintiff"), seeks declaratory and injunctive relief against

19

construction and operation of an Emergency Drought Salinity Barrier at West False River ("Salinity

20

Barrier" or "the Project"[1]) by the California Department of Water Resources ("DWR"). Doc. 1. The

21

Complaint also seeks to require the U.S. Fish and Wildlife Service ("FWS") to "reinitiate consultation of

22

the 2008 Biological Opinion on the Coordinated Operations of the Central Valley Project [] and State

23

Water Project [] ... due to changed circumstances, to wit, the construction and operation of the Project by

24

the Department." *Id*. at ¶ 2. Plaintiff claims that the Salinity Barrier was installed and operated without

25

---

[1] The parties sometimes refer to the Salinity Barrier as "the Project."

following procedures necessary to prevent "take" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*, of the ESA-listed delta smelt. *See id.* ¶¶ 46-72. It is undisputed that the Salinity Barrier was installed in May 2015 and completely removed by November 15, 2015. *Id.* at ¶¶ 12, 14, 34

Before the Court for decision is DWR's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, or, in the alternative, to dismiss or abstain in accordance with *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Doc. 10. CESAR filed an opposition on February 19, 2016. Doc. 12. DWR filed a reply on February 25, 2016. Doc. 13. The Court took the matter under submission on the papers pursuant to Local Rule 230(g).

## II. **STANDARD OF DECISION**

"To invoke a federal court's subject matter jurisdiction, a plaintiff needs to provide only a 'short and plain statement of the grounds for the court's jurisdiction,'" as required by Rule 8(a)(1), and "must allege facts, not mere legal conclusions, in compliance with the pleading standards established by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). A party may raise a challenge to the court's exercise of jurisdiction over the subject matter of an action under Federal Rule of Civil Procedure 12(b)(1). Faced with a Rule 12(b)(1) motion, a party seeking to establish jurisdiction bears the burden of proving the existence of such jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

A Rule 12(b)(1) jurisdictional attack may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a "facial" attack, the challenger accepts as true the plaintiff's allegations but "asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a "factual" attack, the challenger "contests the truth of the plaintiff's factual allegations, usually by introducing evidence

1    outside the pleadings." *Leite*, 749 F.3d at 1121. In such circumstances, a court may examine extrinsic

2    evidence without converting the motion to one for summary judgment, and there is no presumption of

3    the truthfulness of the Plaintiff's allegations. *Safe Air for Everyone*, 373 F.3d at 1039. Moreover, the

4    plaintiff "bears the burden of proving by a preponderance of the evidence that each of the requirements

5    for subject-matter jurisdiction has been met." *Leite*, 749 F.3d at 1121.

6    ### III. <u>LEGAL BACKGROUND</u>

7    "Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with

8    identifying threatened and endangered species and designating critical habitats for those species."

9    *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 778 (9th Cir. 2014) (en banc) ("*NRDC v. Jewell*")

10    (citing 16 U.S.C. § 1533). FWS and the National Marine Fisheries Service ("NMFS") administer the

11    ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11,

12    222.101(a), 223.102, 402.01(b). Section 7 of the ESA ("Section 7") requires federal agencies to ensure

13    that their activities do not jeopardize the continued existence of listed endangered or threatened species

14    or adversely modify those species' critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal.*

15    *v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). Section 7's implementing regulations provide

16    that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any

17    action may affect listed species or critical habitat[s]." 50 C.F.R. § 402.14(a). An agency proposing to

18    take an action (often referred to as the "action agency") must first inquire of FWS[2] whether any

19    threatened or endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. §

20    1536(c)(1). If endangered species may be present, the action agency must prepare a "biological

---

[2] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), as corrected (Oct. 31, 2008). NMFS is granted jurisdiction over fish species which (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id.* FWS exercises jurisdiction over the delta smelt. Therefore, the remainder of this Memorandum Decision references only FWS as the agency administering the relevant ESA provisions.

1   assessment" ("BA") to determine whether such species "is likely to be affected" by the action. *Id*. If the

2   BA determines that a threatened or endangered species "is likely to be affected," the agency must

3   formally consult with FWS. *See id*. § 1536(a)(2); 50 C.F.R. 402.14. Formal consultation results in the

4   issuance of a "biological opinion" ("BiOp") by FWS. *See id*. § 1536(b). If the BiOp concludes that the

5   proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id*. §

6   1536(a)(2), then the action may not go forward unless FWS can suggest a "reasonable and prudent

7   alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If

8   the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical

9   habitat, or that there is a "reasonable and prudent alternative[ ]" to the agency action that avoids

10  jeopardy and adverse modification, and that the incidental taking of endangered or threatened species

11  will not violate section 7(a)(2), the consulting agency can issue an "Incidental Take Statement" which, if

12  followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. 16

13  U.S.C. § 1536(b)(4); *ALCOA v. BPA*, 175 F.3d 1156, 1159 (9th Cir. 1999).

14        Even after consultation is complete, an agency has a duty to reinitiate formal consultation under

15  certain circumstances, including where (1) "the amount or extent of taking specified in the incidental

16  take statement is exceeded"; (2) "if new information reveals effects of the action that may affect listed

17  species or critical habitat in a manner or to an extent not previously considered"; or (3) "[i]f the

18  identified action is subsequently modified in a manner that causes an effect to the listed species or

19  critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16. "The consultation

20  requirement reflects "a conscious decision by Congress to give endangered species priority over the

21  'primary missions' of federal agencies." *Karuk Tribe*, 681 F.3d at 1020 (quoting *Tenn. Valley Auth. v.*

22  *Hill*, 437 U.S. 153, 185 (1978)).

23        Regulations promulgated to implement the ESA's consultation provisions provide that "[w]here

24  emergency circumstances mandate the need to consult in an expedited manner, consultation may be

25  conducted informally through alternative procedures" followed by formal consultation once the

4

emergency is abated. 50 C.F.R. § 402.05(a). The regulations explain that "[t]his provision applies to situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." *Id*. The FWS & NMFS Section 7 Consultation Handbook ("Handbook")[3] provides further detail, explaining that "[a]n emergency is a situation involving an act of God, disasters, casualties, national defense or security emergencies, etc., and includes response activities that must be taken to prevent imminent loss of human life or property." Handbook at 8-1. The action agency is responsible for determining whether an emergency exists and must submit information to either FWS or NMFS, as appropriate, describing the nature of the emergency action and the justification for the expedited consultation. 50 C.F.R. § 402.05(b).

During the initial stage of emergency consultation, FWS's role "is to offer recommendations to minimize the effects of the emergency response action on listed species or their critical habitat (the informal consultation phase)." Handbook at 8-1, § 8.2(A). FWS may not "stand in the way of the response efforts." *Id*. As soon as practicable after the emergency is under control, the action agency must initiate formal consultation with FWS if listed species or critical habitat have been adversely affected by emergency response activities. 50 C.F.R. § 402.05(b); Handbook at 8-4, § 8.2(B). "Although formal consultation occurs after the response to the emergency, procedurally it is treated like any other formal consultation," Handbook at 8-4, § 8.2(B), and culminates in FWS's issuance of a biological opinion, and, if appropriate, incidental take statement, *id*. at 8-4 to 8-5, § 8.2(C)-(D); 50 C.F.R. § 402.05(b).

## IV. FACTUAL BACKGROUND

The Central Valley Project ("CVP") and the State Water Project ("SWP"), "operated respectively by the Bureau of Reclamation ("Reclamation") and the [DWR for the] State of California, are perhaps the two largest and most important water projects in the United States." *San Luis & Delta-*

---

[3] *Available at* http://www.fws.gov/Endangered/esa-library/pdf/esa_section7_handbook.pdf (last visited June 17, 2015).

*Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014). "These combined projects supply water originating in northern California to more than 20,000,000 agricultural and domestic consumers in central and southern California." *Id.* As part of CVP operations, Reclamation releases water stored in CVP reservoirs in northern California, which then flows down the Sacramento River to the Sacramento-San Joaquin Delta ("Delta"). *Id.* at 594. Pumping plants in the southern region of the Delta then divert to various users south of the Delta. *See id.* at 594-95.

The delta smelt (*Hypomesus transpacificus*) is a "small, two-to-three inch species of fish endemic to the [Delta]." *Id.* at 595. In 1993, FWS concluded the delta smelt's population had declined by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA. Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854, 12,855 (Mar. 5, 1993). FWS further determined that "Delta water diversions," including those resulting from operations of the SWP and CVP, are the most significant "synergistic cause[]" of the decline in the delta smelt population. *Id.* at 12,859.

According to the complaint, DWR claims installation of the Salinity Barrier was necessary to protect a "relatively small segment of the State's water users from costs related to saltwater inflow from the ocean." Doc. 1 ("Compl.") at ¶ 3. The Complaint further alleges that DWR first proposed barrier installation in the Delta in 2008. *Id.* at ¶ 37. DWR formally announced a project involving rock barriers across three different channels at West False River in early 2014. *Id.* In January 2015, DWR began to formally study a three-barrier project and applied to the Army Corps of Engineers ("Army Corps") for a Clean Water Act permit ("CWA Permit") to install three barriers. *Id.* at ¶ 38. In late April 2015, DWR amended its proposed project to a single 750-foot wide rock barrier to be installed at West False River. *Id.* at ¶¶ 37-39. In early May 2015, after initiating "emergency consultation" with FWS, the Army Corps issued a CWA Permit for the Project, DWR approved the Project, and construction commenced. *Id.*

Plaintiff filed suit in the Superior Court of California for Sacramento County on May 6, 2015, raising claims under the California law and the federal ESA, Defendant's Request for Judicial Notice

1    ("DRJN"), Doc. 10-2, Ex. 4, and immediately applied ex parte for a temporary restraining order to halt

2    construction of the Salinity Barrier. *Id.*, Ex. 5. Hon. Christopher Krueger held a hearing and issued a

3    minute order denying the request for a temporary restraining order on May 15, 2015. *Id.*, Ex. 6. On June

4    22, 2015, CESAR filed a "First Amended Petition for Writ of Mandate and Complaint for Declaratory

5    Relief," from which they omitted any federal ESA claims. *Id.*, Ex. 7. On October 22, 2015, the state

6    court sustained DWR's demurrer and dismissed the entire action. *Id.*, Ex. 10-12. On December 18, 2015,

7    Plaintiff filed a notice of appeal. *Id.*, Ex. 13.

8         On June 11, 2015, Plaintiff commenced the instant action and moved for injunctive relief against

9    construction of the Project. *Id.*, Ex. 14 (*Center for Environmental Science, Accuracy and Responsibility*

10   *v. Cowin*, 1:15-cv-00884 LJO BAM ("*CESAR I*"), Doc. 1). Plaintiff claimed installation and operation

11   of the Project violated the ESA. *Id.* On June 18, 2015, the Court denied Plaintiff's motion for a

12   temporary restraining order. *CESAR I*, Doc. 22. On September 14, 2015, the Court granted DWR's

13   motion to dismiss *CESAR I* on the ground that Plaintiff had failed to comply with the ESA's 60-day

14   notice requirement. *CESAR I*, Doc. 36.

15                                     **V. <u>DISCUSSION</u>**

16   **A.    <u>60-Day Notice Requirement.</u>**

17        The ESA precludes the commencement of citizen suits "prior to sixty days after written notice of

18   the violation has been given to the [FWS], and to any alleged violator of any such provision or

19   regulation." 16 U.S.C. § 1540(g)(2)(A)(i). The 60-day notice requirement is "jurisdictional, and thus

20   failure to strictly comply is an absolute bar to bringing suit under the ESA." *Conservation Congress v.*

21   *Finley*, 774 F.3d 611, 617 (9th Cir. 2014) (internal quotation and citation omitted). To satisfy the notice

22   requirement, a plaintiff must "provide sufficient information of a violation so that [FWS and/or the

23   action agency] could identify and attempt to abate the violation." *Sw. Ctr. for Biological Diversity v.*

24   *U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998).

25        Here, Plaintiff alleges that:

                                              7

1

> As required by 16 U.S.C. § 1540(g)(2)(A)(i), plaintiff, CESAR, provided
> the defendants notice of the violations described in this complaint by
> letters dated September 18, 2015. Plaintiff sent the notice to each of the
> defendants by U.S. mail. More than 60 days have passed since Defendants
> received these notices and Defendants have not responded to the notices.
> At no time has the Secretary of the Department of Interior initiated an
> action related to the Project pursuant to 16 USC 1540(a) and has not
> brought a criminal action against the party in federal or state court.

2

3

4

5

Compl. at ¶ 33.

6

Defendant moves to dismiss for lack of subject matter jurisdiction because Plaintiff does not

7

attach any 60-day notice letter to the Complaint. *See* Doc. 10 at 5. But Defendant fails to cite and the

8

Court cannot locate any authority requiring notice letters be attached to an ESA Complaint. Plaintiff has,

9

instead attached its notice of intent to sue letter ("Notice Letter") to its opposition to the instant motion

10

to dismiss. *See* Declaration of Leah R. Zabel ("Zabel Decl."), Doc. 12-1 & Attachments. Defendant

11

points to *Southwest Center*, 143 F.3d at 520, to suggest that Plaintiff must "properly allege compliance

12

with the ESA's notice requirement" and that such allegations must specifically describe the content of

13

the notice letters. *See* Doc. 13 at 2. *Southwest Center* says nothing of the sort. Rather, *Southwest Center*

14

articulates the specificity with which notice must be given <u>in the notice letter</u>. *Id*. at 520-22. The

15

Complaint sufficiently alleges compliance with the ESA's notice requirements. The fact that CESAR

16

was "warned" about the notice requirement in a prior order in *CESAR I* does not change the fact that the

17

law does not require notice letters be attached to the Complaint.

18

Defendant does not argue that the Notice Letters provide insufficient notice of the allegations

19

contained in the complaint. *See* Doc. 13 at 2-3. Although the Court is under no *sua sponte* obligation to

20

compare the Notice Letter to the Complaint, even a cursory review of the two documents reveals that the

21

Notice Letter parallels the allegations in the Complaint closely enough to "provide sufficient

22

information of a violation so that [FWS] could identify and attempt to abate the violation." *Sw. Ctr.*, 143

23

F.3d at 522.

24

Defendant points out that the Notice Letter "muddies the waters," at least somewhat, by referring

25

1   both to the now-removed summer 2015 barrier and elsewhere to unspecified other "barriers,"

2   presumably possible future barriers. *See* Zabel Decl., Ex. 2 (Doc. 12-3). To the extent the Notice Letter

3   refers to anticipatory violations, those violations are not actionable, *see, e.g.*, *Natural Res. Def. Council*

4   *v. Kempthorne*, 539 F. Supp. 2d 1155, 1179 (E.D. Cal. 2008), but it does not appear that Plaintiffs are

5   raising presently any challenges to anticipated barriers in the Complaint. To the extent that the Notice

6   Letter and the Complaint challenge past violations, Defendant argues such claims are moot. Mootness, is

7   a separate issue and is, therefore, discussed separately below. The motion to dismiss on this ground is

8   DENIED.

9   **B.    Mootness.**

10      Defendant next argues that the Court lacks subject matter jurisdiction over the case because

11   Plaintiff's claims are moot. Doc. 10-1 at 7-11. An issue is moot "when the issues presented are no longer

12   'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529

13   U.S. 277, 287 (2000). "The underlying concern is that, when the challenged conduct ceases such that

14   there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the

15   court to grant any effectual relief whatever to the prevailing party." *Id.* (internal citations and quotations

16   omitted). If the parties cannot obtain any effective relief, any opinion about the legality of a challenged

17   action is advisory. *Id.* "Mootness has been described as the doctrine of standing set in a time frame: The

18   requisite personal interest that must exist at the commencement of the litigation (standing) must continue

19   throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22

20   (1997) (internal citation and quotation omitted). "[A]n actual controversy must be extant at all stages of

21   review, not merely at the time the complaint is filed." *Id.* at 67.

22      "The party asserting mootness has a heavy burden to establish that there is no effective relief

23   remaining for a court to provide." *In re Palmdale Hills Property, LLC*, 654 F.3d 868, 874 (9th Cir.

24   2011). Mootness is evaluated on a claim-by-claim basis. *San Luis & Delta-Mendota Water Auth. v.*

25   *Jewell*, 52 F. Supp. 3d 1020, 1045 (E.D. Cal. 2014); *Pac. Nw. Generating Co-op. v. Brown*, 822 F. Supp.

9

1  1479, 1506 (D. Or. 1993), aff'd, 38 F.3d 1058 (9th Cir. 1994) (citing *Headwaters, Inc. v. Bureau of*

2  *Land Management*, 893 F.2d 1012, 1015-16 (9th Cir. 1989) (separately addressing mootness as to

3  different forms of relief requested)); *see also In re Pac. Lumber Co.*, 584 F.3d 229, 251 (5th Cir. 2009)

4  (evaluating mootness on a claim-by-claim basis).

5     It is undisputed that the Project challenged in the Complaint, the drought barrier installed in

6  May 2015, was removed as of November 15, 2015, several days before the Complaint was filed.

7  Therefore, this case is technically moot. Even so, an otherwise moot case may nevertheless be justiciable

8  if one of three exceptions to the mootness doctrine applies: (1) where a plaintiff "would suffer collateral

9  legal consequences if the actions being appealed were allowed to stand"; (2) where defendant

10 voluntarily ceased the challenged practice; or (3) for "wrongs capable of repetition yet evading review."

11 *Ctr. for Biological Diversity v. Lohn,* 511 F.3d 960, 964-66 (9th Cir. 2007).

12    Here, Plaintiff appears to rely on the third exception, for "wrongs capable of repetition yet

13 evading review," by arguing that there is a "reasonable expectation" that the "drought barriers" will be

14 reconstructed. *See* Doc. 12 at 3. This exception "permit[s] suits for prospective relief to go forward

15 despite abatement of the underlying injury [in] exceptional[4] situations where the following two

16 circumstances [are] simultaneously present: (1) the challenged action [is] in its duration too short to be

17 fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same

18 complaining party would be subjected to the same action again." *Fed. Elec. Com'n v. Wisconsin Right to*

19 *Life, Inc.*, 551 U.S. 449, 462 (2007) (internal citations and quotations omitted); *San Luis & Delta-*

20 *Mendota Water Auth. v. United States*, 672 F.3d 676, 703 (9th Cir. 2012); *San Luis & Delta-Mendota*

21 *Water Auth. v. U.S. Dep't of the Interior*, 870 F. Supp. 2d 943, 959 (E.D. Cal. 2012) ("*San Luis v.*

22 *DOI*").

23    The first factor – whether the duration of the challenged action is too short to allow for complete

24 ─────────────────

25 [4] In line with the Supreme Court's explanation that this exception only applies in exceptional cases when the two stated conditions are met, the Ninth Circuit only applies the exception in "extraordinary cases." *West Coast Seafood Processors Ass'n v. Natural Res. Def. Council*, 643 F.3d 701, 704 (9th Cir. 2011).

1   litigation – is present here. The challenged action lasted from May through November 2015. While it

2   may have been possible to file and resolve a motion for emergency injunctive relief during that

3   timeframe, it is not possible to <u>fully</u> litigate an ESA challenge in such a short period of time. *See Meyer*

4   *v. Grant*, 486 U.S. 414, 417 (1988) (where state law permitted only six months to obtain necessary

5   signatures to place an initiative on the ballot, challenge to other aspects of the state's initiative procedure

6   could not be litigated fully before time period expired); *see also Alcoa, Inc. v. Bonneville Power Admin*.,

7   698 F.3d 774, 787 (9th Cir. 2012) (suggesting processes lasting from between 12 and 17 months are

8   likely to "evade review" before completion).[5]

9          The second factor – whether there is a reasonable expectation that Plaintiff would be subject to

10  the same action again – is a closer call. "Under the 'capable of repetition' prong of the exception to the

11  mootness doctrine, [a plaintiff has] the burden of showing that there is a reasonable expectation that [it]

12  will once again be subjected to the challenged activity." *Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1390

13  (9th Cir. 1985) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). "Specifically, the plaintiff must

14  establish a demonstrated probability that the same controversy will recur involving the same litigants."

15  *Id*. (citing *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)). According to the CWA permit filed by DWR

16  with the Army Corps, DWR is again requesting authorization for the installation of a "West False River

17  Salinity Barrier"[6] as early as April 1, 2016, to be removed by November 20, 2016, "if DWR, in

18

---

19  [5] Defendant cites *Native Village Of Noatak v. Blatchford*, 38 F.3d 1505, 1509-10 (9th Cir. 1994), for the proposition that
20  "CESAR cannot demonstrate how [] any possible future construction of a drought barrier or barriers is inherently limited in
     duration such that it is likely to become moot before federal court litigation is complete, especially considering that
     construction of any barrier will take several weeks." Doc. 13 at 7. But, *Noatak* does not support this assertion. In Noatak, the
21  plaintiffs challenged a statute that was in place for <u>four years</u>, before being repealed. *Id*. at 1510. The Ninth Circuit found that
     this four-year period was "ample time" within which to challenge enforcement of regulations promulgated under that statute
     while they were in place. *Id*. Defendant's citation of this case in this manner verges on misrepresentation. Likewise, the Court
22  finds *Center for Biological Diversity v. Lohn*, 511 F.3d 960, 965 (9th Cir. 2007), cited by Defendant, inapposite. There, the
     plaintiff challenged NMFS's application of a particular policy to conclude listing of a species was not warranted. *Id*. at 962.
23  NMFS later determined that the species warranted a listing status, and moved to dismiss the lawsuit as moot. *Id*. The Ninth
     Circuit concluded that the application of the policy to deny a listing was not "inherently limited in duration such that it is
24  likely always to become moot before federal court litigation is completed." *Id*. at 965. This conclusion made sense in the
     context of that case, where the agency's reversal on the ultimate listing determination was not tied to any predictable
     timeframe. Here, by contrast, the Project itself is of "inherently limited duration."
25  [6] Even though the grammar of the 2016 CWA permit application leaves open the possibility that more than one barrier would
     be installed at West False River, Defendant offers no authority to suggest that the "capable of repetition yet evading review"

11

cooperation with other State and federal agencies, determines that a drought has reduced water storage in the [SWP] to critical levels, such that projected Delta outflow could not control increased salinity in the Delta." Defendant's Second Request for Judicial Notice, Ex. 1, Doc. 14-1. Although the Court cannot divine the coming year's hydrology, documents submitted by DWR suggest that there is a not insignificant chance that drought conditions will persist for years to come. *See* DRJN, Ex. 1 (January 17, 2014 Proclamation of State of Emergency by California Governor Edmund G. Brown (stating "extremely dry conditions have persisted since 2012 and may continue beyond this year and more regularly into the future, based on scientific-projections regarding the impact of climate change on California's snowpack….")). This is sufficient to establish a "demonstrated probability" that a drought barrier may be needed in 2016.

What is far less clear is how the relevant government agencies will approach their responsibilities under the ESA. Plaintiff's chief complaint in this case is that the approval process for the installation of the Salinity Barrier in 2015 utilized the ESA's emergency consultation procedures, rather than the standard consultation process. Nothing in the complaint (or any other part of the present record) indicates with clarity how the relevant agencies will approach ESA consultation in 2016. Therefore, it remains unclear whether "there is a reasonable probability that the same controversy will recur involving the same litigants." However, pleading standards do permit the Court to make reasonable inferences from facts alleged in the Complaint. *Iqbal*, 556 U.S. at 663("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). It is now early March 2016. If DWR plans to install a drought barrier as soon as May 2016, it is not unreasonable to infer that emergency consultation is the only form of consultation that can be accomplished within this timeframe. The Court will not reach this conclusion, however, without affording Defendants an opportunity to demonstrate otherwise. A briefing schedule for

exception would not apply where the potential repetition involves a larger, more complex version of the original Project.

1    supplemental filings on this issue is set forth below.

2    **C.    <u>Colorado River.</u>**

3        DWR argues that this Court should dismiss this action under the abstention doctrine articulated

4 in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Federal courts

5 have a "virtually unflagging" obligation to adjudicate claims within their jurisdiction. *Id.*; *United States*

6 *v. Morros*, 268 F.3d 695, 703 (9th Cir.2001). As such, "abstention is permissible only in a few carefully

7 defined situations with set requirements." *Morros*, 268 F.3d at 703 (internal quotation marks omitted);

8 *see also Colo. River*, 424 U.S. at 813, 96 S.Ct. 1236 (noting that abstention is proper only in

9 "exceptional circumstances"). The Ninth Circuit has summarized the *Colorado River* doctrine and

10 related Circuit jurisprudence as follows:

11
12
13
14
15
16
17
18
19
20
      [I]n Colorado River ... the federal government brought suit against water users in federal court, seeking a declaration of water rights in certain rivers and tributaries in Colorado. [424 U.S.] at 805. Colorado had previously established seven water districts to adjudicate water rights in ongoing state court proceedings. *Id*. at 804. After the government filed its suit in federal court, several of the defendants in that case filed an application joining the government as a party in the state court proceedings for the relevant water district. *Id*. at 806. The district court then dismissed the government's federal suit in light of the ongoing state court proceedings. On appeal, the Supreme Court held that although none of the traditional abstention doctrines applied, "considerations of [w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," justified dismissal of the federal suit. *Id*. at 817 (alteration in original) (internal quotation marks omitted). The Court noted several factors that supported dismissal, relying particularly on the "highly interdependent" relationship between the claims in the state and federal proceedings and the federal policy, embodied in the McCarran Amendment, of avoiding piecemeal adjudication of water rights. *Id*. at 819-20

21
22
23
24
25
.
      The [Supreme] Court has carefully limited *Colorado River*, emphasizing that courts may refrain from deciding an action for damages only in "exceptional" cases, and only "the clearest of justifications" support dismissal. *Id*. at 818-19. In *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, the Court held that no exceptional circumstances justified the district court's stay of an action to compel arbitration under the Federal Arbitration Act. 460 U.S. 1, 19 (1983). The Court noted that although a state court suit involving the underlying claims was pending when the federal suit was filed, the federal suit did not increase the risk of

piecemeal litigation; substantial progress had already been made in the federal suit; federal law provided the rule of decision on the merits of the case; and there was substantial doubt as to whether the state court could issue the remedy sought in federal court. *Id*. at 19-26.

To decide whether a particular case presents the exceptional circumstances that warrant a Colorado River stay or dismissal, the district court must carefully consider "both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise." *Colorado River*, 424 U.S. at 818. Drawing from *Colorado River*, *Moses H. Cone* and subsequent Ninth Circuit cases, we have recognized eight factors for assessing the appropriateness of a Colorado River stay or dismissal: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court. *Holder [v. Holder]*, 305 F.3d [854,] 870 [(9th Cir. 2002)].

*R.R. St. & Co. Inc. v. Transp. Ins. Co*., 656 F.3d 966, 978-79 (9th Cir. 2011) (footnotes omitted).[7]

"These factors are to be applied in a pragmatic and flexible way, as part of a balancing process rather than as a mechanical checklist." *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co*., 843 F.2d 1253, 1257 (9th Cir. 1988). Yet, "[a]ny doubt as to whether a factor exists should be resolved against a stay." *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1369 (9th Cir. 1990).

Here, although there are numerous reasons why *Colorado River* abstention is inappropriate, the Court will address two prominent factors. First, the state court proceedings cannot resolve all issues before the federal court because it is undisputed the state court case <u>has been dismissed</u>. Defendants do not cite and the Court cannot locate a single case applying Colorado River abstention where the parallel state court litigation is not ongoing. The fact that Plaintiff has filed a notice of appeal does not change the fact that judgment has been entered in the state court case.

Second, despite the fact that Plaintiff included an ESA claim in its original state law complaint,

---

[7] Although a court may either stay or dismiss a case or claims under *Colorado River*, the Ninth Circuit generally requires a stay rather than a dismissal. *R.R. St. & Co.*, 656 F.3d at 978 n.8

*see* Doc. 10-2 at Ex. 4, ¶¶ 31-35, which otherwise sought relief for violations of state law, Plaintiff likely could not have obtained relief in state court under the federal ESA. *See San Bernardino Valley Audubon Soc. v. Metro. Water Dist.*, 71 Cal. App. 4th 382, 391 (1999) (citing 16 U.S.C. § 1540(c) for the proposition that federal court is the proper forum to allege violations of the federal ESA); *see also* 16 U.S.C. § 1540(c) ("The several district courts of the United States, including the courts enumerated in section 460 of Title 28, shall have jurisdiction over any actions arising under this chapter."

## VI. <u>CONCLUSION</u>

For the reasons set forth above:

(1) Defendant's motion to dismiss is DENIED as to the 60-day notice issue;

(2) Defendant's motion to dismiss/stay under *Colorado River* is DENIED; and

(3) Defendant shall have until March 16, 2016 to submit a supplemental brief not to exceed 7 pages (not including necessary exhibits) on the subject of mootness, as discussed above; Plaintiff shall have seven (7) additional days to file a response with the same page limit.

Because the pending motion to amend the complaint, Doc. 18, rests largely on the argument that amendment is necessary to cure deficiencies in the complaint pointed out by the instant motion to dismiss, the Court believes it is in the interest of judicial efficiency to hold the motion to amend in abeyance until the mootness issue is resolved, particularly because the proposed amended complaint does not substantially alter the state of the record on the key mootness issue identified herein.[8]

IT IS SO ORDERED.

Dated:   **March 4, 2016**                    **/s/ Lawrence J. O'Neill**
                                        UNITED STATES DISTRICT JUDGE

---

[8] The Court is aware that CESAR has requested to shorten time for hearing the motion to amend, Doc. 18-1, but because that request is premised entirely on the ground that the motion to dismiss is pending, *id.*, the Court declines to shorten time on the motion to amend.